IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RICHARD T. WOODCOCK,               )        CASE NO. 5:15CV930
                                   )
              Plaintiff,           )
                                   )
       v.                          )
                                   )        MAGISTRATE JUDGE
                                   )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL             )
SECURITY ADMINISTRATION,           )
                                   )        **MEMORANDUM OPINION & ORDER**
              Defendant.           )

Plaintiff Richard Woodcock ("Woodcock") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 18.

As set forth more fully below, the Administrative Law Judge ("ALJ") confused two

reports that reached different conclusions and thus failed to explain adequately his assessment of

the testing performed with respect to Woodcock's mental impairments.  As a result, the

undersigned cannot conduct a meaningful review of the Commissioner's decision and is unable

to conclude that the Commissioner's decision is supported by substantial evidence. Accordingly,

the Commissioner's decision is **REVERSED and REMANDED** for further proceedings

consistent with this opinion.

### I. Procedural History

On June 8, 2012, Woodcock protectively filed an application for DIB and SSI, alleging a

disability onset date of April 15, 2011.  Tr. 13, 179.  He alleged disability based on the

following: mental issues, back and hand problems, and hepatitis C.  Tr. 208.  After denials by the

state agency initially (Tr. 99, 100) and on reconsideration (Tr. 131, 132), Woodcock requested an

administrative hearing.  Tr. 148.  A hearing was held before Administrative Law Judge ("ALJ")

Jeffrey Raeber on June 20, 2014 (Tr. 35-68).  In his July 15, 2014, decision (Tr. 13-29), the ALJ

applied the two-step analysis used in cases where substance abuse is an impairment and

determined that, due to his substance abuse disorder, Woodcock could not maintain employment

on a regular and sustained basis but, in the absence of his substance abuse disorder, Woodcock

could perform jobs that exist in significant numbers in the national economy, i.e., he was not

disabled.  Tr. 17-18, 28.  Woodcock requested review of the ALJ's decision by the Appeals

Council (Tr. 8) and, on April 1, 2015, the Appeals Council denied review, making the ALJ's

decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Woodcock was born in 1967 and was 44 years old on the date his application was filed.

Tr. 20.  Previously he worked as a package car driver for UPS for 20 years.  Tr. 40.  He was

terminated from that position in 2011 as a result of a car accident after which he tested positive

for heroin.  Tr. 40-41.  He admitted to previously abusing pain medications and using heroin and

bath salts on a daily basis.[1]  Tr. 49.  He stopped using illegal substances in September 2012 after

undergoing rehabilitation.  Tr. 48.

---

[1]  Defendant explains,

"Bath salts" are central nervous system stimulants that inhibit the norepinephrine-dopamine reuptake
system and can lead to serious, and even fatal adverse reactions. . . On September 7, 2011, the U.S. Drug
Enforcement Agency announced emergency scheduling to control MDPV, mephedrone and methylone, all
chemicals found in "bath salts." In July of 2012, U.S. President Barack Obama signed into law a ban on
mephedrone, methylone and MDVP, all chemicals found in "bath salts," by placing them on the Schedule I

**B. Relevant Medical Evidence[2]**

**1. Pre-sobriety evidence**

Prior to and during 2011, Woodcock was treated for neck, arm and back pain and numbness in his hands. Tr. 258, 270. In October 2011, he was arrested for possession of drugs, drug abuse and drug paraphernalia, driving while under a suspended license, and improper registration. Tr. 177.

**Consultative Examiner Opinion:** On August 1, 2012, Woodcock saw clinical neuropsychologist Joshua Magelby, Ph.D., for a consultative examination. Tr. 285-291. Woodcock admitted to "past 'everything' abuse," including "hard drugs" for six years, such as heroin and bath salts. Tr. 286. He no longer used bath salts "because they aren't around, and they were killing me." Tr. 286. He also drank alcohol "every day since I was 14" but stopped about two years earlier. Tr. 286. Dr. Magelby wrote, "he was somewhat guarded about current drug abuse, but claims he no longer uses bath salts. Tr. 286.

Woodcock reported difficulty being around others and listening to people. Tr. 286-287. He reported talking to himself, moodiness, and hearing voices. Tr. 287. He also claimed having maladaptive personality symptoms related to paranoid, schizotypal and avoidant personality disorders, but he was not manic, delusional or psychotic. Tr. 287. At the time, Woodcock was living with a friend; he was married and his children had been taken by Child Protective Services. Tr. 287. He could dress, bathe and take care of his personal hygiene needs and was

---

controlled substances list. Schedule I controlled substances cannot be sold under any circumstances and cannot be prescribed for medical purposes. *See*, www.drugs.com, last visited on October 26, 2015.

Doc. 15, p. 2, n. 1.

[2] Woodcock only challenges the ALJ's decision with respect to his mental impairments and matters related to his substance abuse. *See* Doc. 13. Accordingly, only the medical evidence relating to Woodcock's mental impairments and substance abuse is summarized herein.

independent in activities of daily living without limitations or restrictions.  Tr. 287.  He spent most of the day watching television.  Tr. 287.  He reported poor energy and limited social activities.  Tr. 287.

Upon examination, Woodcock was alert and oriented to person, place and time, but had variable eye contact and was somewhat irritable and agitated.  Tr. 287-288.  His thought content was linear and there was no evidence of confusion.  Tr. 288.  His ability to understand and comprehend simple directions appeared good but his ability to understand more complex directions was below average.  Tr. 288.  His sensory and cognitive functioning were mostly fair, including simple attention, mental planning, and mental organization, but his common sense reasoning and general fund of information was poor; his mental processing speed was somewhat slowed; and his intelligence was estimated to be borderline.  Tr. 288.  He had had functional literacy skills and no evidence of diminished capacity.  Tr. 288.

Dr. Magelby diagnosed Woodcock with polysubstance dependence, mood disorder, psychotic disorder, personality disorder, and borderline intellectual functioning.  Tr. 289.  He assessed a Global Assessment of Functioning (GAF) score of 51.[3]  Tr. 289.  He opined that Woodcock was somewhat impaired in his ability to understand, remember and carry out simple instructions; maintain attention and concentration, persistence and pace to perform simple, repetitive tasks; and relate to peers, coworkers and supervisors.  Tr. 290.  Woodcock's ability to withstand the day-to-day pressures of work activity was impaired due to his polysubstance dependency, moodiness and maladaptive personality traits.  Tr. 291.

---

[3]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id*.

**State Agency Reviewer Opinion:** On August 2, 2012, state agency psychologist Aracelis Rivera, Psy. D., reviewed Woodcock's record to date, including Dr. Magelby's opinion. Tr. 76-81.  Regarding Woodcock's mental residual functional capacity ("RFC"), Dr. Rivera found that Woodcock was able to carry out one- to three-step tasks without demand for fast pace or strict production quotas, make simple work-related decisions, adhere to a schedule, relate appropriately on a superficial and infrequent basis with others, and respond appropriately to infrequent changes in a static environment.  Tr. 80.

On August 21, 2012, Woodcock saw physician Vince Snarr, D.O., for a consultative physical examination.  Tr. 293-295.  Woodcock reported pain in his hands and back.  Tr. 293. He also alluded to psychiatric issues and that he does not like being around people.  Tr. 293.  He could write, cook, clean, bathe and dress himself.  Tr. 294.  He admitted to recreational drug use, stating that when he would run out of his pain medication, Dilaudid, he "goes to the streets to find pain medication and uses heroin."  Tr. 294.  Dr. Snarr noted that Woodcock has "an odd affect with him being confused at times as well as repeating himself quite often."  Tr. 295.

### 2. Post-sobriety evidence

 On December 19, 2012, Woodcock saw therapist Blaine F. Muehlbauer at Portage Path Behavioral Health.  Tr. 327-328.  He was living at the Salvation Army and had been participating in the chemical dependency program there.  Tr. 327.  He had been sober for three months.  Tr. 327.  He reported no cognitive impairment.  Tr. 327.  Muehlbauer described him as appearing mildly dazed and confused with some minimal latency to his responses.  Tr. 327.

The next day, Yuan-Hua Thakore, M.D., performed a psychiatric evaluation.  Tr. 322-326.  Dr. Thakore noted that Woodcock was a poor historian.  Tr. 322.  Woodcock stated that he was referred to Portage Path by the Salvation Army and also reported that he was referred to

Portage Path several years prior when Children's Services took away his children, but that he did not follow through with the recommendation at that time. Tr. 322. He complained of problems with his thinking, concentration and memory. Tr. 322. He felt anxious around people and avoided being around them. Tr. 322. His drug use was longstanding and he used intravenous heroin daily for five years. Tr. 323. His wife also used drugs. Tr. 323. He reported that his paternal grandparents were alcoholics. Tr. 323. Upon examination, Dr. Thakore found that Woodcock's psychomotor responses were retarded, he was slow to process information, and he had difficulty finding words. Tr. 324. His affect was flat, his judgment fair, his behavior cooperative, he had poverty of thought, and his thoughts were blocked though logical. Tr. 324. Dr. Thakore diagnosed Depressive Disorder NOS, Anxiety Disorder NOS, and Polysubstance Dependence and assigned a GAF of 51. Tr. 325. She prescribed Cymbalta for anxiety and depression and advised abstinence from alcohol and drugs. Tr. 324.

On January 9, 2013, Woodcock returned to Muehlbauer and reported that he was doing very poorly. Tr. 319. He forged his sponsor's signature on a verification form which delayed his completion of the substance abuse program. Tr. 319. When attending AA meetings and hearing others talk about their using behaviors, he had urges to leave and use substances. Tr. 319.

On January 24, 2013, Woodcock saw Dawn McKinney, R.N., for a medication management visit. Tr. 317-318. He was still living at the Salvation Army and remained sober and clean. Tr. 317. He reported being more tired than ever since he started the Cymbalta and was still depressed. Tr. 317. McKinney observed that his movements and speech were slow. Tr. 317. McKinney advised Woodcock to take his medication before bedtime and to return to discuss his side effects with Dr. Jylia Lobanova, M.D. Tr. 317. At his appointment with Dr.

Lobanova on February 11, 2013, his Cymbalta dosage was increased and he started Trazodone. Tr. 314-315.

On February 13, 2013, Woodcock reported to Muehlbauer that he was still at the Salvation Army but was unhappy with the program there. Tr. 312-313. He continued to attend AA meetings and to be clean and sober; he had also gotten a new sponsor. Tr. 312. Muehlbauer commented that Woodcock was unhappy with the consequences of forging his sponsor's signature and minimized having done so. Tr. 312. He was unhappy with the regimen at the Salvation Army and the limitations placed upon him. Tr. 312. Meuhlbauer commented that Woodcock "appears to be minimizing his addiction and his apparently tenuous hold on sobriety." Tr. 312. They discussed the severe consequences he had already experienced, such as his loss of longstanding job and marriage, and Meuhlbauer pointed out that the Salvation Army program could be helpful but would depend, at least in part, on Woodcock's attitude. Tr. 312.

On March 4, 2013, Woodcock reported to Muehlbauer that he left the Salvation Army and his drug treatment program there two weeks ago without discussing his withdrawal with anyone at the facility. Tr. 310. He moved in with his father and had regular contact with his wife, who had been attending AA meetings daily. Tr. 310. Woodcock reported attending a couple of AA meetings a week but avoided discussion meetings because he did not like to talk. Tr. 310. Muehlbauer noted that he could not get Woodcock to be specific about his reasons for making decisions in his life such as leaving the Salvation Army. Tr. 310. Upon examination, Woodcock's memory was poor; he did not know his child's birthday or his father's age, even within a few years, and was unaware of other events as well. Tr. 310. His judgment and insight were poor and his thoughts concrete; his affect was flat, behavior cooperative and mood depressed. Tr. 310.

On a visit with Dr. Lobanova on March 7, Woodcock reported that he did not attend any AA meetings that week because he had "no ride."  Tr. 308-309.  He was very slow to answer questions and complained of memory problems.  Tr. 308.  Dr. Lobanova continued his Cymbalta and increased his Trazodone to improve his sleep.  Tr. 308.  He failed to show for his medicine management appointment on March 21, 2013.  Tr. 307.

Woodcock saw Muehlbauer on March 26, 2013, and continued to demonstrate a flat affect, depressed mood, poor insight, fair judgment and concrete thought.  Tr. 305-306.  He stated that, with respect to work, "My motivation is shot."  Tr. 305.  He agreed to psychological testing to assess his memory and motivation issues.  Tr. 305.  At a medication management appointment with Nurse McKinney on April 2, 2013, Woodcock complained of continuing problems with focus and memory but reported "some clarity" since starting Cymbalta.  Tr. 303.  He still had difficulty sleeping and depression.  Tr. 303.

On April 16, 2013, Woodcock reported attending AA meetings with his wife twice a week, but stated, "I don't need any of that."  Tr. 301.  He "sometimes gets angry in response to what is discussed in meetings."  Tr. 301.  Muehlbauer commented that Woodcock "lacks insight into the nature of addiction." Tr. 301.

On May 7, 2013, Woodcock declined a referral to the Ohio Bureau of Rehabilitation because he did "not think he could get a job due to having been fired from UPS and past legal infractions."  Tr. 349.  On May 9, 2013, Dr. Lobanova changed his Cymbalta for Prozac and increased his Trazodone for sleeping.  Tr. 347-348.  On May 20, Woodcock reported that the Prozac "was working out so far" and that he was sleeping well.  Tr. 345.

On July 1, 2013, Woodcock returned to Portage Path after having been in Florida helping his brother; his medication had run out the week prior.  Tr. 340-341.   He was "restarted" on Prozac and Trazodone.  Tr. 340.

On July 22, 2013, Woodcock reported that he has been doing "ok" and his depression and sleep were "up and down."  Tr. 336.  His mood was euthymic.  Tr. 336.  He had been watching his 11-year old son and his 3-year old granddaughter and had been providing care for his father. Tr. 336.  His affect was constricted/ blunted.  Tr. 333.  On August 15, 2013, Woodcock reported getting his driving privileges restored and assisting his mother around the house.  Tr. 333.  On September 6, 2013, Woodcock stated that he could not work because of problems with his back. Tr. 381.  He was encouraged to learn some basics about computers and the internet and to provide more supervision to his son.  Tr. 381.  On September 19, 2013, he reported that his medications were effective but McKinney observed that he appeared depressed.  Tr. 380.

On October 24, 2013, Woodcock admitted to having a beer six months earlier but stated that he had been drug free for over a year.  Tr. 375.  He complained of continued difficulty sleeping and also reported that he had coffee in the morning and "drinks Coke all day until 4 pm."  Tr. 375.  He stated that the Prozac was working and he was advised to cut out all caffeine. Tr. 375-376.  On October 31, 2013, Muehlbauer advised Woodcock to watch his father more closely after his father started a fire while smoking in bed, and to perform more household chores in lieu of paying rent.  Tr. 374.  He canceled his appointment set for November 2013.  Tr. 372.

On January 9, 2014, Woodcock reported feeling depression coming back since the winter had started and difficulty sleeping.  Tr. 367.  He still drank caffeinated beverages until 4 pm.  Tr. 367.  His Prozac dosage was increased and cutting out caffeine was discussed.  Tr. 367.  On

January 16, 2014, Woodcock reported "doing decently." Tr. 366.  He was attending AA meetings twice a week with his wife.  Tr. 366.  On February 25, 2014, Woodcock reported performing most household chores in lieu of rent.  Tr. 363.

**Treating Provider Opinion:** On April 16, 2013, Meuhlbauer completed a mental medical source assessment form on behalf of Woodcock.  Tr. 329-330.  Muehlbauer opined that Woodcock had noticeable difficulty 20% of the time or more in his ability to understand, remember and carry out short simple instructions, maintaining attention and concentration for an extended period of time, and completing a workday and workweek without unreasonable breaks and rest periods.  Tr. 329.  Muehlbauer opined that Woodcock had some difficulty 11-22% of the time performing activities within a schedule, sustaining an ordinary routine, and working in proximity to others.  Tr. 329.  He had some difficulty interacting with others and accepting criticism from supervisors and would be unable to respond appropriately to changes in the work setting.  Tr. 330.  Muehlbauer indicated that Woodcock would he absent from work more than four days per month due to treatment or symptoms of his impairment.  Tr. 330.  Muehlbauer explained that Woodcock's coping skills were "quite limited" and that his general cognitive skills appeared to be impaired, at least moderately.  Tr. 330.  He was depressed, lacked motivation and energy, and was uninterested in most things.  Tr. 330.

**Cognitive Testing/Opinion Evidence:** On May 20, 2014, Portage Path psychology assistant Robert Clapp, supervised by psychologist Phillip Scozzaro, Ph.D., generated a report based on a five-part psychological evaluation of Woodcock.[4]  Tr. 403-409.  The testing dates range from May 2013 to March 2014.  The Wechsler Adult Intelligence Scale-IV showed

---

[4]  There are two reports in the record: an unsigned version with testing dates listed as May, September and October 2013 (Tr. 393-397) and a signed version with testing dates listed as May, September and October 2013, and March 4 and March 31, 2014.  Tr. 403-409.  The Court discusses the difference between these two report in further detail, *infra*.

Woodcock to have a Full Scale IQ of 79, a Verbal Comprehension score of 89, a Perceptual

Reasoning score of 90, a processing speed score of 59, and a working memory score of 86.  Tr.

405.  Clapp opined that Woodcock's low processing speed could be emotionally based.  Tr. 405.

On the Vineland II test he showed significantly subnormal ability with adaptive behaviors,

mostly communication and daily living skills, which, Clapp opined, were likely related to his

struggles with receptive language and processing information when he is in the community.  Tr.

407.  His receptive language ability was tested as at level of age 7.2.  Tr. 407.  Based on these

results, Clapp stated that Woodcock appears to be dealing with some difficulties in verbal

processing skills that, in turn, strongly affects his memory; these will affect his overall ability to

follow directions and remember tasks he needs to complete.  Tr. 409.  He had difficulties with

tasks that require him to process information rapidly; these combined with his memory delays

created a significant general cognitive disorder.  Tr. 409.  Despite this, Clapp opined that

Woodcock does well with learning mechanical skills and could respond to training; he also

presented as a polite and social person who could work with others.  Tr. 409.  Woodcock was

diagnosed with cognitive disorder, NOS; depressive disorder, NOS; anxiety disorder, NOS; and

polysubstance dependency; and was assessed a GAF score of 51.  Tr. 396.  Clapp recommended

additional neuro-psychological testing and that, once that testing was complete, Woodcock may

wish to apply to the Bureau of Vocational Rehabilitation for "assistance in adapting to

difficulties he would likely still have in attempting to process information in an academic or

occupational situation."  Tr. 409.

**Treating Provider Opinion:** On April 11, 2014, Muehlbauer completed a second mental

medical assessment form.  Tr. 398-399.  Muehlbauer opined that Woodcock had no ability to

carry out very short and simple instructions, was unable to complete a normal workday due to

psychological based symptoms or maintain a consistent pace without an unreasonable number and length of rest periods, and had noticeable difficulty accepting instructions and responding appropriately to criticism from supervisors.  Tr. 398-399.  He would be unable to respond appropriately to changes in the work setting, use public transportation, set realistic goals or work independently, and would miss more than four days per month due to his symptoms or treatment. Tr. 398-399.

### C.  Testimonial Evidence

#### 1.  Woodcock's Testimony

Woodcock was represented by counsel and testified at the administrative hearing.  Tr. 36-61.  Since he separated from his job at UPS, he has been spending time with his father, who is dying, at his father's home, and helping out around the house.  Tr. 41.  He lives there with his father, his step-mother, his wife, minor son, and granddaughter.  Tr. 42.  He has been living there for the past year and a half.  Tr. 42.  Years ago, he attended "something for unemployment" but has not pursued employment since shortly after losing his job.  Tr. 41, 61.

Woodcock stated that he last drove a car in November and that he has not driven since then because he cannot afford the insurance.  Tr. 42.  His wife drove him to the hearing.  Tr. 43. During the day, he watches his son and see if his father needs anything and if he is all right.  Tr. 43.  He and his wife watch his granddaughter on Saturdays.  Tr. 43.  He cooks, performs chores inside the house, sometimes mows the lawn, and picks up after the dogs.  Tr. 44.  He goes to feed the ducks and has been going to AA meetings once or twice a week and bible study on Thursday nights.  Tr. 44.  He no longer sees any of his friends because they all "use" and he cannot be around them anymore.  Tr. 44-45.  He has some friends "at AA and whatnot."  Tr. 45.  He traveled to an indoor water park on an overnight trip and went to Florida with his brother.  Tr.

45.  He went to help out his brother at his mother's house there.  Tr. 45.  He stayed there a week or 10 days.  Tr. 45-46.

Woodcock graduated from high school and went to college for two or three years and studied hospitality management and business.  Tr. 46.  He has difficulty in AA meetings when there is a discussion with six or seven people and they read something and then ask him to explain or talk about it because "by the time it gets around to me, it's like I forgot what they were even talking about."  Tr. 46.  As a result, he goes to AA "lead" meetings where someone else talks and tells their story.  Tr. 47.  He has had alcohol since he went into the Salvation Army in September 2012 but he has not touched any drugs except what the doctors give him.  Tr. 48, 58.  Previously, he was using "clean medication, heroin, and a lot of bath salts."  Tr. 49.  He used drugs every day.  Tr. 57.  When he was taking drugs they caused him a lot of problems; he got in trouble a lot and made poor decisions.  Tr. 49.  His wife of twenty years did drugs for a long time and then he started doing them too.  Tr. 50.

When asked what problems he had currently, after giving up drugs, that caused him to become unable to work, Woodcock answered, "confusion and whatnot.  The ability to get up and get to—I would guess, get to work.  I can't even—it's hard to comprehend just getting there— just going and just getting there on time with a vehicle[.]"  Tr. 50.  He has trouble getting from one point to another.  Tr. 51.  He takes the bus sometimes but has problems; "it takes too long to get to a place."  Tr. 51.  He stated, "coordinating the times and whatnot, it just seems like a nightmare."  Tr. 51.  He has trouble getting instructions and explained that his wife will tell him something and she will think he is ignoring her, but really he just does not remember what she said; "it's like I don't comprehend it or it doesn't enter right into my mind."  Tr. 51.  He explained that the difference between his mental state while we was working before he started

doing drugs and his mental state after having stopped doing drugs is that it is now harder to take things in and compute them.  Tr. 52.  This started towards the end of his career and the drug use may have contributed to it.  Tr. 52-53.  He always had a bad memory and when he was in high school he had to study for five, six hours a night.  Tr. 53.  He stated that he is not a lazy person and that he always worked hard, but that there is something wrong with his head now and his memory is not good.  Tr. 54.  It is also harder for him to learn how to do new things.  Tr. 59.  He read a 300-page book when he was at the Salvation Army and he cannot recall what was in it; "I can't tell you a thing about it."  Tr. 60.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Karen Kroll testified at the hearing.  Tr. 61-65.  The ALJ confirmed that the VE understood Woodcock's past relevant work.  Tr. 62.  The ALJ asked the VE to determine whether a hypothetical individual of Woodcock's age, education and work experience could perform the work he performed in the past if the individual had the following characteristics: can perform light work; can never climb ladders, ropes or scaffolds; can never crawl; can perform simple, routine, and repetitive tasks; is limited to a work environment that is free of fast-paced production requirements involving only simple routine workplace changes; and can have occasional interaction with the public and superficial contact, meaning no negotiation or confrontation, with others. Tr. 62.  The VE answered that such an individual could not perform Woodcock's past relevant work.  Tr. 96.  The ALJ asked if such an individual could perform any work and the VE answered that such an individual can perform work as a housekeeper (100,000 national jobs), marker (200,000 national jobs), and mail sorter (43,000 national jobs).  Tr. 63.

Next, the ALJ asked the VE whether the hypothetical individual could perform the jobs identified by the VE above if the individual had the following, additional characteristic: can frequently handle objects with his right hand. Tr. 63. The VE answered that such an individual could perform the same jobs listed above. Tr. 63. The ALJ asked the VE whether her answer would change if the hypothetical individual can frequently handle objects bilaterally. Tr. 64. The VE replied that the answer would not change. The ALJ asked the VE if the latter hypothetical individual could perform the same jobs listed above if the individual would be limited to hearing and understanding simple oral instructions or could learn by demonstration. Tr. 64. The VE answered that such an individual could perform the three jobs listed above. Tr. 64. Lastly, the ALJ asked the VE to what extent an individual could be off task and still be able to perform the jobs identified, and the VE answered that an individual could be off task 10 percent of the time. Tr. 64.

Next, Woodcock's attorney asked the VE whether the hypothetical worker, considering the three jobs described by the VE, could perform work consistent with competitive employment if the individual required a supervisor to check in about once every 20 minutes and prompt him as to what he is supposed to be doing or give him reminders about how to complete whatever task he was assigned. Tr. 64-65. The VE stated that this limitation would not be consistent with competitive employment. Tr. 65. Woodcock's attorney asked the VE whether the individual could sustain employment if he only completed about 75 percent of the tasks assigned to him and the VE answered that such an individual could not sustain employment. Tr. 65. Woodcock's attorney asked what the tolerance for absenteeism is at the unskilled work level and the VE replied, "generally, no more than one day per month." Tr. 65.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

If the Commissioner finds that a claimant is disabled and there is medical evidence of the

claimant's drug addiction or alcoholism, the Commissioner must determine whether the drug

addiction or alcoholism is a contributing factor material to the disability determination.  20

C.F.R. § 404.1535.  To make this determination, the Commissioner considers whether the

claimant would still be disabled if she stopped using drugs or alcohol by evaluating which of the

claimant's limitations would remain if she stopped using drugs or alcohol and then determining

whether the remaining limitations would be disabling.  *Id.*

### IV. The ALJ's Decision

In his July 15, 2014, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security
        Act through December 31, 2016.  Tr. 15.

2.      The claimant has not engaged in substantial gainful activity since April
        15, 2011, the alleged onset date.  Tr. 15.

3.      The claimant has the following severe impairments: carpal tunnel
        syndrome, cervical and lumbar radiculitis, polysubstance abuse,
        depressive disorder, personality disorder, cognitive disorder, anxiety
        disorder.  Tr. 16.

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 16.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b) and §416.967(b) except he can never climb ladders, ropes, or scaffolds.  He can never crawl.  He is limited to hearing and understanding simple oral instructions or can learn by demonstration.  The claimant can perform simple, routine and repetitive tasks.  The work environment must be free of fast-paced high production requirements and routine work place changes.  The claimant can occasionally interact with the public. He can have superficial contact, defined as no negotiation or confrontation with others.  Due to polysubstance abuse, the claimant would need additional breaks, need to leave work early or be off task such that the claimant would not be capable of maintaining an eight hour workday or forty hour workweek on a regular and sustained basis.   Tr. 17-18.

6.      The claimant is unable to perform any past relevant work.  Tr. 20.

7.      The claimant was born on December 5, 1967 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 20.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 20.

9.      The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above.  Tr. 20.

10.     Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorder, there are no jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 20.

11.     If the claimant stopped the substance abuse, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.  Tr. 21.

12.     If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 21.

18

13.  If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b) and §416.967(b) except he can never climb ladders, ropes, or scaffolds.  He can never crawl.  He is limited to hearing and understanding simple oral instructions or can learn by demonstration. The claimant can perform simple, routine and repetitive tasks.  The work environment must be free of fast-paced high production requirements and routine work place changes.  The claimant can occasionally interact with the public. He can have superficial contact, defined as no negotiation or confrontation with others.  Tr. 22-23.

14.  If the claimant stopped the substance use, the claimant would continue to be unable to perform past relevant work.  Tr. 28.

15.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 28.

16.  If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform.  Tr. 28.

17.  The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use.  Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date though the date of this decision.  Tr. 29.

## V. Parties' Arguments

Woodcock objects to the ALJ's decision on three grounds.  He argues that substantial evidence did not support the ALJ's purported determination that Woodcock continued to abuse drugs and alcohol, that the ALJ's assessment of Woodcock's cognitive testing was unsupported and unexplained, and that, as a result, the ALJ's RFC assessment and hypothetical question to

the VE was unsupported by substantial evidence.[6]  Doc. 13, pp. 14-23.  In response, the

Commissioner submits that the ALJ properly considered the evidence with respect to

Woodcock's drug and alcohol abuse, his cognitive testing, the opinion evidence, and

Woodcock's RFC assessment.  Doc. 15, pp. 12-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### A.  The ALJ's consideration of Woodcock's substance abuse was not erroneous

Woodcock appears to suggest that the ALJ erroneously determined that he continued to

abuse drugs and alcohol.  Doc. 13, p. 16.  He asserts that he has been sober since 2012 and there

is no evidence in the record that he has relapsed.  *Id*.  He argues, "the ALJ's assumption that

Woodcock's drug and/or alcohol abuse is affecting his ability to work is misplaced."  *Id*.  The

Court disagrees that the ALJ determined that Woodcock continued to abuse substances.  At no

point in his decision does the ALJ reference ongoing drug use or assume that Woodcock

---

[6]  Woodcock's headings, and his legal authority cited in support of his arguments, challenges the ALJ's assessment
of the opinion evidence.  However, Woodcock primarily challenges the ALJ's assessment of the testing results and
the opinion(s) based on those results.

continued to abuse drugs.  No portion of the record evidences continuing substance abuse.

In his reply brief, Woodcock explains that the subheadings used by the ALJ in his decision repeatedly state, "If the claimant stopped the substance use..."  Doc. 16, p. 1.  The Court agrees that the ALJ could have framed his subheadings with more accuracy; however, inartfully worded subheadings do not make the ALJ's decision "internally inconsistent and inconsistent with the weight of the evidence," as Woodcock contends (Doc. 16, p. 3).  Instead, the ALJ's decision clearly delineates Woodcock's impairments before he became sober and his impairments after he became sober.  Tr. 17-23.  Importantly, Woodcock's alleged onset date was April 15, 2011, prior to the time he became sober in September 2012.

20 C.F.R. § 404.1535, "How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability," provides,

> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

>> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

>> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535.

Here, the ALJ considered Woodcock's impairments, including his substance abuse disorder, and discussed the evidence in the record up to the time he became sober, in September 2012.  Tr. 18-20.  The ALJ found that, due to his uncontested substance abuse during that time period, Woodcock would need additional breaks and would have to leave work early or be off task such that he could not maintain an 8-hour workday or 40-hour workweek on a regular and sustained basis.  Tr. 18.  The ALJ then went on to find that, without the substance abuse impairment and the limitations imposed by the same, he could perform work in the national economy.  Tr. 23, 38.  In support, the ALJ discussed the evidence in the record dated after Woodcock became sober in September 2012.  Tr. 23-28.  Thus, the ALJ followed the regulations and, despite the inclusion of the word "if" in the ALJ's subheadings (most likely copied from the language in the regulation), the ALJ's decision is not "confusing" or "too difficult for reviewers to trace [his] line of reasoning on this topic," as Woodcock asserts (Doc. 16, p. 3).  *See, e.g., Jenkins v. Colvin*, 2016 WL 2605035, at *4 (M.D.Fla. May 6, 2016) (plaintiff's argument that the ALJ erred because his decision did not accurately report that his substance abuse had ceased was without merit; "the ultimate issue is not whether Plaintiff continuously abused substances," but "whether Plaintiff was disabled if he had stopped his substance use during the relevant period.") (alterations omitted).

### B. The ALJ incorrectly summarized the testing results, failed to explain what "opinion" he gave significant weight to, and failed to explain how, based on the results and opinion, he assessed Woodcock's mental RFC

As explained above, there are two reports in the record that contain summaries of Woodcock's results from cognitive testing performed over numerous visits in 2013 and 2014. One report (unsigned) is based on testing performed on May 30, September 23, and October 14,

2013; the date of the report is listed as June 3 and November 25, 2013.  Tr. 393.  The second

report is based on testing performed on the same three days in 2013 as the first report and, in

addition, March 4 and March 31, 2014.  The second report is dated May 20, 2014, and is signed

by both Psychology Assistant Clapp and his supervisor, Dr. Scozzaro.  Tr. 409.  This second

report includes the results of additional tests, including the "Vineland II" test, which found

Woodcock's receptive language ability to be at age 7.2.  Tr. 407.  Thus, it appears as though the

testing, which Defendant concedes is based on five parts (Doc. 15, p. 8), was concluded and

summarized in the May 2014 report and that the first report was incomplete, showing interim

results based only on three testing days rather than all five testing days.[7]

> The first, interim report contained the following summary:

> .... Based on the results of this testing, Mr. Woodcock appears to be dealing with some difficulties *in his memory that may effect [h]is overall ability* to follow directions and remember tasks he needs to complete.  In addition, Mr. Woodcock has difficulties with tasks that require that he process information rapidly, to such a degree that when combined with his memory delays create *a general cognitive disorder.*  This is reflected by his borderline intellectual ability and creates problem solving challenges.  Despite this, Richard does well with learning mechanical skills and could respond to training.  Richard also presents himself as a polite and social person who could work with others.

Tr. 396 (emphasis added).  The second, final report contained the following summary:

> .... Based on the results of this testing, Mr. Woodcock appears to be dealing with some difficulties *in verbal processing skills[;] these, in turn, strongly effect his memory that will effect [h]is overall ability* to follow directions and remember tasks he needs to complete.  In addition, Mr. Woodcock has difficulties with tasks that require that he process information rapidly, to such a degree that when combined with his memory delays create *a significant* general cognitive disorder.  This is reflected by his borderline intellectual ability and creates problem solving challenges.  Despite this, Richard does well with learning mechanical skills and could respond to training.  Richard also presents himself as a polite and social person who could work with others.

Tr. 409 (emphasis added).

---

[7] There was some confusion as to the difference between these tests at the Hearing.  *See, e.g.*, Tr. 65-67 (conversation between the ALJ and Woodcock's attorney discussing the two different, but similar, reports).

Thus, the two reports reached different conclusions.  The first concluded that some difficulties in memory "may effect [Woodcock's] overall ability to follow directions and remember tasks"; the second concluded that difficulties in verbal processing skills "strongly effect his memory that will effect [h]is overall ability to follow directions and remember tasks." Despite this difference, the ALJ, citing both reports, characterized the testing results as follows:

> During the assessment, the claimant did have some difficulty *in verbal processing skills that could have an effect on his ability* to follow directions and remember tasks he would need to complete.  He also had difficulties with tasks that required his ability to process information rapidly, that when combined with his memory delays created *a cognitive disorder*.  However, despite his cognitive deficits, the claimant would be better at mechanical skills and could respond to training.  He presented as polite and a social person who could work with others [].  I give significant weight to the opinion that was based on the psychological assessment.

Tr. 26.  The ALJ conflated the two reports, summarizing them as concluding that Woodcock's verbal processing skills (only mentioned in the second report) "could have" an affect (from the first report, instead of "will have" an affect in the second report) on his ability such that he has a cognitive disorder (from the first report, instead of a "significant" cognitive disorder in the second report).  Thus, it does appear that the ALJ skewed the language and "cherry-picked" portions of the testing to minimize the results, as Woodcock alleges (Doc. 16, pp. 4-5). Moreover, it is not clear which of the two "opinions" the ALJ is giving significant weight to. The ALJ does not say, and a reviewer cannot know.  On remand, the ALJ can clarify his assessment of the testing and the related opinion evidence and better explain how this evidence supports an RFC assessment.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

Dated: May 23, 2016

_____
Kathleen B. Burke
United States Magistrate Judge